1  Joel E. Elkins (SBN 256020)
   jelkins@weisslawllp.com
2  **WEISSLAW LLP**
   9107 Wilshire Blvd., Suite 450
3  Beverly Hills, CA 90210
   Telephone: 310/208-2800
   Facsimile:  310/209-2348
4
5  *Attorneys for Plaintiff*
   *and the Proposed Class*
6
   [Additional counsel appear on signature page]
7

8

9                    UNITED STATES DISTRICT COURT

10                  NORTHERN DISTRICT OF CALIFORNIA

11

12  ANJANI KUMAR JHA, On Behalf of      )   Case No.
    Himself and All Others Similarly    )
13  Situated,                           )
                                        )
14                                      )   CLASS ACTION
                     Plaintiff,         )
15                                      )   **CLASS ACTION**
                                        )   **COMPLAINT FOR**
16              vs.                     )   **VIOLATIONS OF THE**
                                        )   **FEDERAL SECURITIES**
17                                      )   **LAWS**
    BROCADE COMMUNICATIONS             )
18  SYSTEMS, INC., LLOYD A.            )   JURY TRIAL DEMANDED
    CARNEY, DAVID L. HOUSE, JUDY        )
19  BRUNER, RENATO A. DIPENTIMA,       )
    ALAN L. EARHART, JOHN W.            )
20  GERDELMAN, KIM C. GOODMAN,          )
    L. WILLIAM KRAUSE, DAVID E.        )
21  ROBERSON, and SANJAY               )
    VASWANI,                            )
22                                      )
                                        )
23                                      )
                                        )
24                   Defendants.        )
                                        )
25

26

27

28
                              - 1 -
                            COMPLAINT

Plaintiff Anjani Kumar Jha ("Plaintiff"), individually and on behalf all others similarly situated, by and through his undersigned counsel, alleges the following upon information and belief, including an examination and inquiry conducted by and through his counsel, except as to those allegations pertaining to Plaintiff, which are alleged upon personal knowledge, as follows:

## <u>NATURE OF THE ACTION</u>

1.      This is a class action brought on behalf of the public stockholders of Brocade Communications Systems, Inc. ("Brocade" or the "Company") against Brocade and its Board of Directors (the "Board" or the "Individual Defendants") for their violations of Sections 14(a) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78n(a), 78t(a), and SEC Rule 14a-9, 17 C.F.R. 240.14a-9 and to enjoin the vote on a proposed transaction, pursuant to which Brocade will be acquired by Broadcom Limited ("Broadcom"), through its U.S.-based subsidiary Broadcom Corporation ("Parent") and Parent's wholly-owned subsidiary Bobcat Merger Sub, Inc. ("Merger Sub") (the "Proposed Transaction").

2.      On November 2, 2016, Brocade and Broadcom issued a joint press release announcing that they had entered into an Agreement and Plan of Merger (the "Merger Agreement") to sell Brocade to Broadcom.  Under the terms of the Merger Agreement, Broadcom will acquire all outstanding shares of Brocade for $12.75 in cash per Brocade common share (the "Merger Consideration").   The Proposed Transaction is valued at approximately $5.5 billion.

3.    As described in more detail below, given Brocade's recent strong performance and its future growth prospects, the consideration stockholders will receive is inadequate and undervalues the Company.  The sale process conducted by the Board was flawed, and virtually ensured that Broadcom would acquire Brocade for an inadequate price.

4.    The Proposed Transaction does not adequately compensate Brocade's public stockholders for the intrinsic value of Brocade's assets.  For example, as recently as November 1, 2016, one day before the announcement of the Merger Agreement, an analyst at RBC Capital Markets set a $14.00 target price for the Company, $1.25 *above* the $12.75 Merger Consideration.  Further, the Company has not yet enjoyed the synergies expected from its May 2016 acquisition of Ruckus Wireless, Inc. ("Ruckus").  As further described below, both the value to Brocade stockholders contemplated in the Proposed Transaction and the process by which defendants propose to consummate the Proposed Transaction are fundamentally unfair to Plaintiff and the other public stockholders of the Company.

5.    After negotiating exclusively with Broadcom for over four months and receiving Broadcom's "best and final" offer, the Board conducted an abbreviated and effectively illusory market check.

6.    Making matters worse, the Board chose a conflicted financial advisor, Evercore Group L.L.C. ("Evercore"), who has extensive and longstanding relationships with Broadcom.  In fact, earlier this year Evercore advised Parent in

connection with its acquisition by Avago Technologies Limited ("Avago Technologies"), which was completed in February 2016. Moreover, Evercore advised Silver Lake Partners ("Silver Lake"), a long-term investor in Broadcom, in a transaction with Dyal Capital Partners which was announced in July 2016. More interested in obtaining future business with Broadcom and Silver Lake, rather than conduct a thorough process to sell the Company, Evercore rubber stamped the inadequate Merger Consideration.

7.      After selecting a conflicted advisor, the Board catered to its own liquidity goals, as well as to the interests of Broadcom. Indeed, while Brocade's public stockholders will be cashed out of the Company for an unfair price and foreclosed from participating in the future growth of the Company, certain Company insiders will substantially benefit if the Proposed Transaction is consummated. For example, defendant Lloyd A. Carney ("Carney"), Chief Executive Officer ("CEO") of the Company, alone stands to receive **nearly $25.3 million** in golden parachute compensation.

8.      Finally, compounding the unfairness of the Proposed Transaction, on December 20, 2016, Brocade filed a Definitive Proxy Statement on Schedule 14A (the "Proxy") with the U.S. Securities and Exchange Commission ("SEC"). The Proxy, which recommends that Brocade stockholders vote in favor of the Proposed Transaction, omits or misrepresents material information concerning, among other things: (i) Brocade's management's projections, utilized by the Company's financial

advisor, Evercore in its financial analyses; (ii) the valuation analyses prepared by Evercore in connection with the rendering of its fairness opinion; and (iii) material information concerning the sale process leading up to the Proposed Transaction.  The failure to adequately disclose such material information constitutes a violation of Sections 14(a) and 20(a) of the Exchange Act as stockholders need such material information in order to make a fully-informed voting decision in connection with the Proposed Transaction.

9.     In short, the Proposed Transaction is designed to unlawfully divest Brocade's public stockholders of the Company's valuable assets without fully disclosing all material information concerning the Proposed Transaction to Company stockholders.   To remedy defendants' Exchange Act violations, Plaintiff seeks to enjoin the Proposed Transaction or to rescind the Proposed Transaction in the event of consummation unless and until such problems are remedied.

## JURISDICTION AND VENUE

10.     This Court has jurisdiction over the claims asserted herein pursuant to 28 U.S.C. §1331 and Section 27 of the Exchange Act, 15 U.S.C. §78aa, and 28 U.S.C. §1331 (federal question jurisdiction) as Plaintiff alleges violations of §§14(a) and 20(a) of the Exchange Act and SEC Rule 14a-9.

11.     The Court has jurisdiction over defendants because each is either a corporation that conducts business in and maintains operations in this District, or is an individual who has sufficient minimum contacts with this District so as to render

the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

12.    Venue is proper in this District pursuant to §27 of the Exchange Act, 15 U.S.C. §78aa, as well as under 28 U.S.C. § 1391 because Plaintiff's claims arose in this District, where a substantial portion of the actionable conduct took place, where most of the documents are electronically stored, and where the evidence exists. Brocade is headquartered in this District.  Moreover, each of the Individual Defendants, as Company officers or directors, either resides in this District or has extensive contacts within this District.

## INTRADISTRICT ASSIGNMENT

13.    A substantial part of the events which give rise to the claims in this action occurred in the County of Santa Clara, and as such this action is properly assigned to the San Jose Division of this Court, as provided by Local Rules 3-2(e) and 3-5(b).  However, as indicated in the Civil Cover Sheet filed concurrently herewith, this action is related to *Steinberg v. Brocade Communications Systems, Inc., et al.,* Case No. 5:16-CV-07081, currently assigned to Honorable Edward M. Chen.

## THE PARTIES

14.    Plaintiff is, and has been at all times relevant hereto, a continuous stockholder of Brocade.

15.    Defendant Brocade is a Delaware corporation with its principal executive offices located at 130 Holger Way, San Jose, CA 95134.  The Company is

a technology company specializing in data and storage networking products. Brocade's common stock is traded on the NASDAQ under the ticker symbol "BRCD."

16. Defendant Carney has been CEO of the Company since January 2013 and a director since February 2013.

17. Defendant David L. House ("House") has been Chairman of the Board since December 2005 and was previously executive Chairman of the Board from January 2005 to December 2005. Defendant House has been a director of the Company since February 2004. Defendant House is a member of the Compensation Committee, the Corporate Development Committee and the Nominating and Corporate Governance Committee.

18. Defendant Judy Bruner ("Bruner") has been a director of the Company since January 2009. Defendant Bruner is Chair of the Audit Committee.

19. Defendant Renato A. DiPentima ("DiPentima") has been a director of the Company since January 2007. Defendant DiPentima is a member of the Nominating and Corporate Governance Committee.

20. Defendant Alan L. Earhart ("Earhart") has been a director of the Company since February 2009. Defendant Earhart is a member of the Audit Committee.

21.    Defendant John W. Gerdelman ("Gerdelman") has been a director of the Company since January 2007.   Defendant Gerdelman is a member of the Audit Committee and the Corporate Development Committee.

22.    Defendant Kim C. Goodman ("Goodman") has been a director of the Company since February 2016.   Defendant Goodman is a member of the Compensation Committee and a member of the Corporate Development Committee.

23.    Defendant L. William Krause ("Krause") has been a director of the Company since 2004.  Defendant Krause is Chair of the Compensation Committee and a member of the Nominating and Corporate Governance Committee.

24.    Defendant David E. Roberson ("Roberson") has been a director of the Company since April 2014.   Defendant Roberson is Chair of the Corporate Development Committee and a member of the Audit Committee.

25.    Defendant Sanjay Vaswani ("Vaswani") has been a director of the Company since April 2004.  Defendant Vaswani is Chair of the Nominating and Corporate Governance Committee and a member of the Compensation Committee.

26.    Defendants Carney, House, Bruner, DiPentima, Earhart, Gerdelman, Goodman, Krause, Roberson and Vaswani are collectively referred to herein as the "Board" or the "Individual Defendants."

## OTHER RELEVANT ENTITIES

27.    Broadcom is a limited liability company organized under the laws of the Republic of Singapore with offices in San Jose, California.  Broadcom is a designer,

developer and global supplier of products based on analog and digital semiconductor technologies.

28.     Parent is a California corporation and an indirect subsidiary of Broadcom.

29.     Merger Sub is a Delaware corporation and a direct wholly-owned subsidiary of Parent.

## CLASS ACTION ALLEGATIONS

30.     Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons and entities that own Brocade common stock (the "Class").  Excluded from the Class are defendants and their affiliates, immediate families, legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

31.     Plaintiff's claims are properly maintainable as a class action under Rule 23 of the Federal Rules of Civil Procedure.

32.     The Class is so numerous that joinder of all members is impracticable. While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through discovery, Plaintiff believes that there are thousands of members in the Class.  As of December 12, 2016, there were approximately 406,282,345 shares of Company common stock issued and outstanding.  All members of the Class may be identified from records maintained by Brocade or its transfer

agent and may be notified of the pendency of this action by mail, using forms of notice similar to that customarily used in securities class actions.

33.     Questions of law and fact are common to the Class and predominate over questions affecting any individual Class member, including, among *inter alia*:

(a)     Whether defendants have violated Section 14(a) of the Exchange Act and Rule 14a-9 promulgated thereunder;

(b)     Whether the Individual Defendants have violated Section 20(a) of the Exchange Act; and

(c)     Whether Plaintiff and the other members of the Class would suffer irreparable injury were the Proposed Transaction consummated.

34.     Plaintiff will fairly and adequately protect the interests of the Class, and has no interests contrary to or in conflict with those of the Class that Plaintiff seeks to represent.  Plaintiff has retained competent counsel experienced in litigation of this nature.

35.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy.  Plaintiff knows of no difficulty to be encountered in the management of this action that would preclude its maintenance as a class action.

36.     Defendants have acted on grounds generally applicable to the Class with respect to the matters complained of herein, thereby making appropriate the relief sought herein with respect to the Class as a whole.

# SUBSTANTIVE ALLEGATIONS

## Company Background and Strong Financial Outlook

37.     Brocade is a leader in fibre channel storage area network switching and IP networking.  Founded in 1995, the Company's first product, SilkWork, was a fibre channel switch, and eventually became the marketing designation for an entire line of products.  After acquiring Foundry Networks in 2008, Brocade entered the market for Ethernet switches and routers.  The Company also develops storage, software and mobile networking, and provides a host of professional and residency services.

38.     On April 4, 2016, Brocade announced that it had entered into a definitive agreement to acquire Ruckus, a global supplier of advanced wireless systems for the mobile internet infrastructure market.  The press release announcing the transaction stated:

> Brocade (NASDAQ: BRCD) and Ruckus Wireless (NYSE: RKUS) today announced that Brocade has entered into a definitive agreement to acquire Ruckus Wireless, Inc. in a cash and stock transaction. ***The acquisition will complement Brocade's enterprise networking portfolio, adding Ruckus' higher-growth, wireless products to Brocade's market-leading networking solutions.*** It will also significantly strengthen Brocade's strategic presence in the broader service provider space, with Ruckus' market-leading Wi-Fi position. ***Brocade expects the transaction to be accretive to its non-GAAP earnings by its first quarter of fiscal 2017.***
>
> * * *
>
> As companies move to digitize their business, they need an underlying network architecture that supports business agility. This New IP architecture enables the network to become a platform for innovation

and for developing, delivering, and securing new applications. Wireless is a critical access technology and the combination of Brocade and Ruckus ***creates a new type of pure-play networking company***, with solutions spanning from the heart of the data center to the wireless network edge. In addition, after close, ***the acquisition is expected to accelerate cross-selling activities*** into the respective companies' partner and customer bases, ***opening up new revenue opportunities*** for the combined company across a variety of verticals, including large enterprises, K-12 and higher education, government, hospitality, and service provider

Further, the acquisition will strengthen Brocade's ability to pursue emerging market opportunities around 5G mobile services, Internet of Things (IoT), Smart Cities, OpenGtm technology for in-building wireless, and LTE/Wi-Fi convergence. Brocade and Ruckus believe that the integration of Wi-Fi and the use of shared access or lightly licensed spectrum are critical to meeting the ever-growing demand for coverage, capacity, and consistency required for next-generation mobile services. ***These elements are important in Brocade's strategy to disrupt and enhance the way edge services are created and delivered.***

Emphasis added.

39.    The Company's financial results underscore its promising prospects, showing significant improvements in recent quarters.  More specifically, on August 25, 2016, the Company issued a press release announcing its fiscal third quarter financial results.  For the quarter, Brocade reported revenue of $591 million, up 7% year over year, thanks in part to Brocade's completion of the Ruckus acquisition. GAAP diluted earnings per share were $0.02, down from $0.21 year over year, which was primarily the result of acquisition-related items.  Defendant Carney commented on the results, noting:

Against the backdrop of a mixed macro environment, we posted solid results, with total revenue at the high end of our outlook range. During

Q3, we also continued the momentum of new product innovations across our portfolio, building a solid foundation for business growth and expansion of our addressable markets. Furthermore, with the successful completion of our acquisition of Ruckus Wireless in the quarter, we are pleased to welcome this talented and committed team to the Brocade family. Our combined strengths open up new opportunities and distinguish Brocade as a pure-play networking company for the digital transformation era.

40.     The Company's financial results continued to improve and on November 21, 2016, the Company reported its financial results for the fiscal fourth quarter and full fiscal year 2016.  For the quarter, revenue was $657 million, an increase of 12% year over year.  Revenue for the fiscal year was $2,346 million, a 4% increase year over year.  The Company reported non-GAAP diluted earnings per share of $0.33 for the quarter and $1.04 for the year, up 27% and 4% year over year, respectively.  Commenting on the favorable results, defendant Carney stated:

Fiscal 2016 was a year of significant accomplishment. ***We delivered record revenue*** and expanded our market reach to address critical requirements at the network edge through our acquisition of Ruckus Wireless. In addition, we provided our customers with significant innovations across our product portfolio, including Gen 6 Fibre Channel, data center automation, Ruckus Cloud Wi-Fi, and next-generation data center routing. With a range of new IP Networking solutions expected to launch in the first quarter of fiscal 2017, we continue to advance our roadmap and help our customers transform their networks for digital business.

Emphasis added.

41.     Broadcom is seeking to acquire the Company at the most opportune time, at a time when the Company is performing well and is positioned for tremendous growth.  Given the Company's record revenue and expected synergies

from the Ruckus transaction that have not yet been realized, the Merger Consideration is inadequate.

**The Flawed Sale Process**

42.     From inception, the Board performed a fundamentally flawed process to sell the Company.  While the Board had the opportunity on multiple occasions to canvass the market to determine whether higher value was attainable for the Company's assets and to its stockholders or to pursue interest in other strategic alternatives that had potential to maximize stockholder value (including selling portions of the business piecemeal), the Board members acted to benefit their own interests and only at the eleventh hour conducted an abbreviated and effectively illusory market check.  The Proxy does not adequately explain why the Board was so determined to sell the Company at a time when its prospects were so bright and the Company's standalone strategy was beginning to bear fruit following the Ruckus acquisition.

43.  Beginning in May 2016, representatives of Brocade and Broadcom began discussions concerning a strategic transaction.  Broadcom expressed interest in acquiring Brocade's fibre channel business, but was informed it was not for sale.

44.     On June 2, 2016, Ken Hao ("Hao"), a Managing Partner and Managing Director at Silver Lake (a long-term investor in Broadcom) and member of Broadcom's board of directors, met with defendant Carney and expressed an interest in exploring potential strategic transactions between Silver Lake and Brocade.

45.     On June 6, 2016, Broadcom's President and CEO Hock E. Tan ("Tan") met with defendant Carney and expressed interest in acquiring the Company as a whole.

46.     On July 14, 2016, Broadcom delivered to Carney a written non-binding confidential indication of interest for the acquisition of the entire Company, which did not contain any information as to price for the acquisition.

47.     On July 20, 2016, the Board held a meeting during which Evercore indicated that it had previously been engaged by Parent in connection with its acquisition by Avago Technologies which was completed in February 2016.   The Board determined that Company management should prepare for and schedule a management presentation with Broadcom and provide financial and other due diligence materials to Broadcom at that time to explore the possibility of a strategic transaction.

48.     On August 12, 2016, undisclosed representatives of the Company held an introductory phone call with a private equity sponsor, referred to in the Proxy as "Sponsor A".  The Proxy fails to disclose any details of the call.

49.     On September 12, 2016, the Board's committee established to work with management to review, consider and in certain cases approve potential strategic and investment transactions (the "Corporate Development Committee"), consisting of defendants Roberson (Chairman), House, Gerdelman and Goodman, held a meeting during which it directed Company management to provide due diligence materials to

Broadcom, including management's initial set of financial projections (the "September Management Case") to Broadcom in preparation for an upcoming September 14, 2016 meeting.

50.     During a September 15, 2016 meeting between defendant Carney and Broadcom President and CEO Tan, Tan indicated that Broadcom would deliver a proposal to acquire Brocade for $12.00 per share in cash.  A written proposal to that effect was delivered the next day.

51.     On September 16, 2016, despite its ties to Broadcom and Silver Lake, the Company formally engaged Evercore as its financial advisor.

52.     Also on September 16, 2016, Brocade representatives met with a representative of Sponsor A to discuss Sponsor A's interest in various potential strategic transactions with the Company, but not an acquisition of the Company by Sponsor A.   The Proxy does to adequately disclose what the potential strategic alternatives Sponsor A was proposing, or why the Board did not seriously consider them as potential value-maximizing options.

53.     On September 25, 2016, the Corporate Development Committee held a meeting with management and the Company's advisors to discuss Broadcom's proposal.   Evercore discussed a list of third parties the Company could consider contacting in exploring potential strategic alternatives. Rather than conduct even a preliminary market outreach to potentially interested parties, the Board determined

COMPLAINT

not to contact these parties until receiving a revised proposal from Broadcom containing a potentially acceptable purchase price.

54.    During an October 2, 2016 telephone call between defendant Carney and Tan, defendant Carney indicated that the Board would not support a transaction below $13.00 per share.  Tan stated that he could not support a price at that level, but that he would convene a Broadcom board of directors meeting to authorize a revised acquisition of $12.75 per share.

55.    On October 3, 2016, the Company received a confidential non-binding indication of interest (the "October 3 Indication of Interest") from Broadcom for $12.75 per Company share in cash.  The October 3 Indication of Interest provided that it was Broadcom's "best and final proposal" and that it wished to execute a definitive agreement by October 30, 2016.

56.    With Broadcom's "best and final proposal" in hand, the Board proceeded to conduct an eleventh hour market check while simultaneously finalizing the Proposed Transaction with Broadcom.

57.    On October 5, 2016, the Board held a meeting during which it instructed management and Evercore to contact four strategic acquirers and four private equity sponsors.  The Board also created a committee (the "Transaction Committee") to oversee and direct management with respect to the strategic transaction process, comprised of defendants Roberson and House.

58.    On October 5 and 6, 2016, Company management and Evercore contacted the eight previously selected parties.  Although the four strategic acquirers ultimately declined to participate, all four of the private equity sponsors (Sponsors A-D) agreed to participate in the process and received draft non-disclosure agreements.

59.    On October 11, 2016, Evercore delivered bid process letters to the four private equity sponsors, requesting preliminary submissions of indications of interest by October 18, 2016.

60.    At an October 15, 2016 Transaction Committee meeting, Evercore reported that Sponsor B, who had been permitted to collaborate with a co-bidder, had indicated that its co-bidder was primarily interested in Brocade's wireless business and Sponsor B was interested in the remaining portion of the Company.  Without even consulting the whole Board, the Transaction Committee dismissed a piecemeal sale of the Company as Broadcom "had required an expeditious timeframe for the signing of a definitive merger agreement."   Again, it is unclear why the Board steadfastly refused to seriously consider such strategic alternatives.  On October 18, 2016, Sponsor A submitted a non-binding indication of interest for $11.50 to $12.00 per share.  Sponsor C submitted a non-binding indication of interest for $11.50 to $12.00 per share.  Sponsor B communicated to Evercore that it would not be submitting a bid and Sponsor D informed Evercore that it was not interested in continuing to explore an acquisition with the Company.

61.     On October 19, 2016 Evercore contacted Sponsors A and C to inform them that their offer prices were insufficient.

62.     On October 31, 2016, the Transaction Committee recommended that the Board approve payment to Evercore of a discretionary fee.

63.     On November 1, 2016, the parties finalized the draft of the merger agreement and Evercore delivered its fairness opinion to the Board.   The Board determined to recommend that stockholders vote in favor of the Proposed Transaction, authorized management to sign the Merger Agreement, and approved the discretionary fee payable to Evercore.

64.     On November 2, 2016, prior to the opening of trading of Company stock on NASDAQ, the parties executed the Merger Agreement.

**The Proposed Transaction is Inadequate**

65.     On November 3, 2016, Brocade and Broadcom issued a joint press release stating, in relevant part:

> SINGAPORE and SAN JOSE, Calif., Nov. 02, 2016 -- Broadcom Limited (Nasdaq:AVGO) and Brocade Communications Systems, Inc. (Nasdaq:BRCD) today announced that they have entered into a definitive agreement under which Broadcom will acquire Brocade, a leader in Fibre Channel storage area network ("FC SAN") switching and IP networking, for $12.75 per share in an all-cash transaction valued at approximately $5.5 billion, plus $0.4 billion of net debt. Broadcom expects to fund the transaction with new debt financing and cash available on its balance sheet. Broadcom, with the support of Brocade, plans to divest Brocade's IP Networking business, consisting of wireless and campus networking, data center switching and routing, and software networking solutions.

* * *

Upon closing, the transaction is expected to be immediately accretive to Broadcom's non-GAAP free cash flow and earnings per share. Broadcom currently anticipates that Brocade's FC SAN business will contribute approximately $900 million of pro forma non-GAAP EBITDA in its fiscal year 2018.

The board of directors of Brocade and the Executive Committee of the board of directors of Broadcom have unanimously approved the transaction, which is presently expected to close in the second half of Broadcom's fiscal year 2017 which commenced on October 31, 2016, subject to regulatory approvals in various jurisdictions, customary closing conditions as well as the approval of Brocade's stockholders. The closing of the transaction is not subject to any financing conditions, nor is it conditioned on the divestiture of Brocade's IP Networking business.

66.     The Merger Consideration fails to recognize the value of Brocade to Broadcom.   In the November 2, 2016 press release, Tan described the benefits Broadcom will enjoy as a result of the Proposed Transaction:

This strategic acquisition enhances Broadcom's position as one of the leading providers of enterprise storage connectivity solutions to OEM customers. With deep expertise in mission-critical storage networking, Brocade increases our ability to address the evolving needs of our OEM customers. In addition, we are confident that we will find a great home for Brocade's valuable IP networking business that will best position that business for its next phase of growth.

The press release also quotes Carney commenting on additional advantages to Broadcom:

Our best-in-class FC SAN solutions will help Broadcom create one of the industry's broadest portfolios for enterprise storage. We will work with Broadcom as it seeks to find a buyer for our IP Networking business which includes a full portfolio of open, hardware and software-based solutions spanning the core of the data center to the network edge.

67.     Moreover, during Broadcom's investor call discussing the Proposed Transaction, Broadcom Chief Financial Officer Tom Krause expanded on the benefits Broadcom will enjoy as a result of the merger:

> In summary, we feel that this is a strategically and financially compelling transaction for multiple reasons.  It will strengthen our leadership position in enterprise storage and add a complimentary franchise to our portfolio.  It will be accretive to gross and operating margins, which will support our new enhanced operating margin target of 45%.  In the process, we will also continue to further diversify our end market revenue exposure.  And lastly, it is immediately accretive to our EPS and boosts our free cash flow.  We expect this will allow us to support meaningful increases in future returns to shareholders.

68.     The inadequate Merger Consideration is further evidenced by the fact that on November 1, 2016, one day before the announcement of the Merger Agreement, analyst Mitch Steves of RBC Capital Markets set a $14.00 target price for the Company, $1.25 ***above*** the $12.75 Merger Consideration.   Additionally, analyst Chad M. Bennett of Craig-Hallum Capital Group LLC set a $13.00 target price for Brocade on September 22, 2016, and analyst James Kelleher of Argus Research Group set a $13.00 target price for the Company on August 31, 2016.

69.     Moreover, the Merger Consideration fails to adequately compensate Brocade's stockholders for the potential value of Brocade to Broadcom.  According to an article published by *Seeking Alpha,* the Proposed Transaction appears to add around $10.00 per share to Broadcom's valuation, and brings Brocade's "strong existing products" to Broadcom's portfolio.

70.   A November 2, 2016 *The New York Times* article titled, "Broadcom to Buy Brocade Communications for $5.5 Billion," explains the spike in acquisitions in the technology and chip industry in recent years:

> The chip industry has had a wave of acquisitions, with more $100 billion in deals in the last two years.
>
> Last week, Qualcomm agreed to acquire NXP Semiconductors for $38.5 billion. In July, SoftBank of Japan bought ARM Holdings, a British chip designer, for $32 billion.
>
> Last year, Intel paid nearly $17 billion for Altera and NXP itself acquired Freescale Semiconductor, for $11.8 billion.
>
> For Broadcom, the Brocade deal represents the latest in a series of transactions since the company formerly known as Avago went public in 2009.

The article further explains Broadcom's reasoning behind the deal noting, "[t]he Brocade transaction is centered around its storage area network business, which provides data storage solutions for businesses, and is expected to complement Broadcom's existing offerings."

71.   A November 2, 2016 *TechCrunch* article titled, "Broadcom acquires Brocade in $5.9 billion deal," elaborates on the benefits Broadcom stands to gain from the Proposed Transaction, explaining:

> While Brocade has a broader networking business, under the terms of the deal, Broadcom will divest the IP networking part of the business including Ruckus Wireless, a company Brocade just recently acquired.
>
> It seems what Broadcom had its eye on was the networking storage part of the business and the company believes that by combining the two lines, they could create a powerful entity in the fibre channel Storage

Area Network (SAN) business.

72.    A November 3, 2016 *E-Commerce Times* article titled "Broadcom Sews Up $5B Deal for Brocade" also explains Broadcom's motivation for the deal, regardless of the value to Brocade stockholders, noting:

> The purchase "moves Broadcom up the product stack while making it a more formidable competitor in networking," noted Jim McGregor, a principal analyst at Tirias Research.
>
> New networks are needed to support the "massive amounts of data being generated by the IoT," he told the E-Commerce Times.
>
> Network builders are employing "more flexible networking concepts, like software-defined networking and network functions virtualization," McGregor noted, which "puts Brocade in one of the leading camps for networking solutions."
>
>                                    * * *
>
> The purchase is in line with Broadcom owner Avago's strategy of pushing into the data center market with the recent purchases of LSI Logic, which makes disk controllers; PLX Technology, which makes PCI-Express chips and switches; and Emulex, which makes fiber channel and Ethernet adapter cards.

**The Board Impermissibly Locked Up the Proposed Transaction**

73.    The Merger Agreement contains deal protection devices which substantially increase the likelihood that the Proposed Transaction will be consummated, leaving Brocade's public stockholders with no meaningful change of control premium for their shares.  When viewed collectively, these provisions, which are detailed below, further the interests of Broadcom, certain Individual Defendants and other Brocade insiders to the detriment of Brocade's public stockholders and

- 23 -
COMPLAINT

cannot represent a justified, appropriate or proportionate response to any threat posed by a potential third party bidder.

74.      The Individual Defendants have agreed to the following unreasonable deal protection devices:

•      A "no-solicitation" clause that prevents Brocade from soliciting, or its directors and officers from even participating in discussions which may lead to a superior proposal from any bidder (Merger Agreement, Section 6.03(b));

•      An "information rights" provision that requires the Company to promptly advise Broadcom of any proposal or inquiries received from other parties, including the material terms and conditions of the proposal and the identity of the party making the proposal (Merger Agreement, Section 6.03(c));

•      A "no waiver" provision that prohibits the Company from terminating, waiving, amending or modifying any standstill or confidentiality agreement (Merger Agreement, Section 6.03(e));

•      A "matching rights" provision that allows Broadcom four (4) business days to re-negotiate with the Board after it is provided with written notice of the Board's intention to make a change of recommendation, plus an additional two (2) business day period following a material amendment to the terms and conditions of a superior offer (Merger Agreement, Section 6.03(g)); and

•      A termination fee of $195 million payable by the Company to Broadcom

if Brocade decides to pursue a competing bid, with no provision requiring Broadcom to pay a reverse termination fee (Merger Agreement, Section 9.03).

75.    The "no-solicitation" clause, the "information rights" provision, the "no waiver" provision, the "matching rights" provision and the termination fee unfairly restrain the Individual Defendants' ability to solicit or engage in negotiations with any third party regarding a proposal to acquire all or a significant interest in the Company.  The circumstances under which the Board may respond to a third party's written bona fide proposal for an alternative acquisition that constitutes or would reasonably be expected to constitute a superior proposal are too narrowly circumscribed to provide an effective "fiduciary out" under the circumstances.

76.    The reason behind these deal protection devices is clear: the absence of a meaningful premium for stockholders creates the very real potential that a third party bidder will attempt to usurp Broadcom and submit a higher bid for Brocade.  The possibility that a third-party bidder will emerge motivated Broadcom to "lock-up" the Proposed Transaction by co-opting the Board and forcing them to adopt unreasonable deal protection devices that would ensure that Broadcom could purchase the Company for less than would otherwise be possible.

77.    Taken as a whole, the foregoing deal protection devices essentially foreclose the possibility that a third-party "white knight" could step forward to provide Brocade stockholders with a premium for their shares, instead of the opportunistic and inadequate compensation offered by the Proposed Transaction.

## Insiders' Interests in the Proposed Transaction

78.     Broadcom and Brocade insiders are the primary beneficiaries of the Proposed Transaction, not the Company's public stockholders.  The Board and the Company's executive officers are conflicted because they will have secured unique benefits for themselves from the Proposed Transaction not available to Plaintiff and the public stockholders of Brocade.

79.     While Brocade's stockholders are receiving inadequate consideration for their valuable Brocade holdings, the Company's directors and officers will achieve a substantial payday.  In addition to the millions of dollars the Individual Defendants and Company management will receive from the sale of their illiquid shares, in connection with the merger, Defendant Carney and certain members of Company management stand to receive millions in golden parachute compensation, as set forth in the following chart:

| Named Executive Officer | Cash ($)(1)(2) | Equity ($)(1)(3)(4) (5)(6) | Perquisites/ Benefits ($)(1)(7) | Total ($)(1) |
|---|---|---|---|---|
| Lloyd A. Carney | 4,250,000 | 21,007,233 | 40,819 | 25,298,052 |
| Daniel W. Fairfax | 930,000 | 5,395,172 | 22,380 | 6,347,552 |
| Jeffrey P. Lindholm | 990,000 | 1,916,716 | 22,380 | 2,929,096 |
| Ken K. Cheng | 955,500 | 5,086,091 | 27,213 | 6,068,804 |
| Gale E. England | 840,000 | 3,887,637 | 15,820 | 4,743,457 |

80.    In addition, the Individual Defendants will benefit from the accelerated vesting of their unvested equity awards, as set forth in the following chart:

| Name | Number of Shares Held (#)(1) | Value of Shares Held ($)(2) | Number of Shares Subject to In-the-Money Options (#)(3) | Cash Out Payment for In-the-Money Options ($)(4) | Number of Shares Subject to RSU Awards (#)(5) | Cash Out Payment for RSU Awards ($)(2) | Total Cash Out Payment for In-the-Money Options and RSU Awards ($) |
|---|---|---|---|---|---|---|---|
| **Non-Employee Directors** | | | | | | | |
| Judy Bruner | 154,474 | 1,969,544 | 40,000 | 285,100 | 15,687 | 200,009 | 485,109 |
| Renato A. DiPentima | 246,800 | 3,146,700 | 60,000 | 403,300 | 15,687 | 200,009 | 603,309 |
| Alan L. Earhart | 111,974 | 1,427,669 | 20,000 | 144,100 | 15,687 | 200,009 | 344,109 |
| John W. Gerdelman | 223,474 | 2,849,294 | 60,000 | 403,300 | 15,687 | 200,009 | 603,309 |
| Kim C. Goodman | 24,438 | 311,585 | — | — | 15,687 | 200,009 | 200,009 |
| David L. House | 328,224 | 4,184,856 | 75,000 | 473,700 | 15,687 | 200,009 | 673,709 |
| L. William Krause | 197,204 | 2,514,351 | 70,000 | 460,300 | 15,687 | 200,009 | 660,309 |
| David E. Roberson | 86,974 | 1,108,919 | — | — | 15,687 | 200,009 | 200,009 |
| Sanjay Vaswani | 217,974 | 2,779,169 | 55,000 | 368,950 | 15,687 | 200,009 | 568,959 |

81.    Therefore, while Brocade's public stockholders will be cashed out for an unfair price and foreclosed from participating in the future of the Company, certain Company insiders will substantially benefit if the Proposed Transaction is consummated.

**The Proxy Contains Numerous Material Misstatements or Omissions**

82.    On December 20, 2016, the defendants filed the materially incomplete and misleading Proxy with the SEC and disseminated it to Brocade's stockholders. The Proxy misrepresents or omits material information that is necessary for the Company's stockholders to make an informed decision whether to vote in favor of the Proposed Transaction.

83.    Specifically, as set forth below, the Proxy fails to provide Company stockholders with material information or provides them with materially misleading information concerning Brocade's financial projections, the *Sum of the Parts Analysis* performed by Evercore in support of its fairness opinion, and the background of the merger.  Accordingly, Brocade stockholders are being asked to vote in favor of the Proposed Transaction without all material information at their disposal.

- 27 -

84.   With respect to Brocade's projections provided by Brocade management and relied upon by the Evercore in performing its analyses, the Proxy discloses projections for various non-GAAP metrics including EBITDA, EPS, Gross Profit, Net Income and Operating Income, but fails to provide line item projections for the metrics used to calculate these non-GAAP measures or otherwise reconcile the non-GAAP projections to GAAP, including, *inter alia*: changes in working capital, changes in deferred revenue, stock-based compensation expense, acquisition and integration expense, restructuring charges, asset impairment charges, gains or losses relating to sales of assets, for fiscal year 2016 only, the impact to cost of revenues from certain purchase accounting adjustments to inventory, GAAP gross profit, amortization expense associated with acquired intangibles, GAAP operating income, GAAP EBITDA, GAAP net income, and non-cash interest expense.  The omission of the aforementioned line item projections renders the non-GAAP projections included in the Proxy materially misleading and incomplete.

85.   The importance of reconciling between GAAP and non-GAAP financial measures has long been widely acknowledged.  The SEC adopted "Regulation G" in 2003, in response to the mandate set forth in Section 401(b) of the Sarbanes-Oxley Act that rules be enacted to regulate the use of pro forma financial information. Regulation G prohibits the use of non-GAAP financial measures outside of SEC filings unless they are accompanied by the most directly comparable GAAP accounting measure, as well as a reconciliation of the two. Such reconciliations

were deemed necessary to address the proliferation of non-GAAP financial measures lacking a uniform definition and therefore carrying the risk of misleading investors.  Although the Proxy warns stockholders that a reconciliation cannot be made without "unreasonable efforts" and that certain specified adjustments "cannot be reliably quantified," the warning was useless because, for example, the Proxy fails to disclose GAAP net income.

86.    Additionally, with respect to Brocade's projections for fiscal years 2016 – 2021, the Proxy fails to disclose the line items utilized in the calculation of unlevered free cash flow for each of the years of projections, including: (i) changes in net working capital; (ii) changes in deferred revenue; (iii) stock-based compensation expense; (iv) acquisition and integration expense; (v) restructuring charges; (vi) asset impairment charges; (vii) gains or losses relating to sales of assets; and (viii) with regard to fiscal year 2016 only, the impact to cost of revenues from certain purchase accounting adjustments to inventory, as listed in the definition.

87.    Moreover, although the Proxy discloses certain Company projection for fiscal years 2016-2021, according to the Proxy "[b]oth the September Management Case and the October Management Case" included "projections for fiscal years 2016 through 2019 and extrapolations derived therefrom for . . . fiscal years 2020 through 2026 for the switching, routing and analytics [("SRA")] and software networking [("Software Networking")] components of the Company's business for use in the sum of the parts valuation of that component."   The SRA and Software Networking

projections for years 2020-2026 are inexplicably left out of the Proxy, despite being the basis of Evercore's *Sum of the Parts Analysis*.

88.     These material omissions of the best estimates of the Company's financial future misleads Brocade's stockholders by providing only selected information.  The omissions need to be remedied prior to the stockholder vote in order to allow Brocade stockholders to make a fully informed voting decision on the Proposed Transaction.

89.     The Proxy also describes Evercore's fairness opinion and the various valuation analyses it performed in support of its opinion.  However, the description of Evercore's fairness opinion and analyses fails to include key inputs and assumptions underlying these analyses.  Without this information, as described below, Brocade's public stockholders are unable to fully understand these analyses and, thus, are unable to determine what weight, if any, to place on Evercore's fairness opinion in determining whether to vote in favor of the Proposed Transaction.  This omitted information, if disclosed, would significantly alter the total mix of information available to Brocade's stockholders.

90.     Evercore conducted a *Sum of the Parts Analysis* to calculate the enterprise value of Brocade's four business components: Storage Networking, SAR, Campus and Ruckus.  However, in addition to failing to disclose the individual business component projections, the Proxy fails to disclose Evercore's basis for utilizing the ***entire Company's*** cash flow or revenue to value three of the four

individual components.  The Proxy states that for both the Storage Networking and SRA components, Evercore utilized "(1) the unlevered, after-tax free cash flows that were projected to be generated by *the Company* from the period from November 1, 2016 through October 31, 2021, plus (2) the estimated terminal value of *the Company* as of October 31, 2021" (emphasis added) to value the individual components.  Similarly, with respect to the Campus component, the Proxy states that Evercore "assumed a multiple range of 1.0x to 1.5x management's projection of *the Company's* estimated fiscal year 2017 revenue" (emphasis added).  However, for the Ruckus component, Evercore utilized "(1) unlevered, after-tax free cash flows that were projected to be generated by *the Ruckus business* from November 1, 2016 through October 31, 2021, plus (2) the estimated terminal value of *Ruckus* as of October 31, 2021" (emphasis added).  The Proxy fails to disclose Evercore's basis for using the cash flows for the entire Company to value the individual and separate SRA and Software Networking components and for using the entire Company's estimated fiscal year 2017 revenue to value the individual Campus component.  This information is particularly material in light of the fact that, with respect to the Ruckus segment, Evercore used cash flow projections for the Ruckus business specifically, as opposed to cash flow projections for Brocade as a whole.

91.    The Proxy also fails to disclose material information relating to, among other things, the background of the Proposed Transaction, including:

(a)     With respect to Sponsor A, (i) the details of the Company's August 12, 2016 call with Sponsor A, including whether Sponsor A expressed interest in acquiring one of the Company's businesses; and (ii) the potential strategic alternatives Sponsor A proposed on September 16, 2016, or why the Board did not seriously consider them as potential value-maximizing options;

(b)     The reasons why the Board accepted the $12.75 per share Merger Consideration, if, at the October 2, 2016 meeting, the Board indicated it would not support a transaction with Broadcom unless the per share valuation was above $13.00 per share;

(c)     The details of Evercore's $35.6 million "transaction fee", including the amount of the "success fee" and what portion of the fee is "discretionary";

(d)     Any services performed by Evercore for the Company between October 2013 and October 2016 in addition to the Company's acquisition of Ruckus Wireless, Inc., including the compensation received for those services.

(e)     Any services performed by Evercore for Silver Lake between October 2013 and October 2016, including the compensation received for those services;

(f)     The reasons (i) why the Board was insistent on selling the Company; (ii) why the Board did not consider pursuing a sale of the Company's separate business units in light of the interest that had been expressed for such a

strategic alternative; (iii) whether the Transaction Committee informed the Board of its October 15, 2016 decision to forego a sale process for the individual business lines; (iv) whether the Board ever asked Evercore for valuations regarding sales of the Company's individual business lines and, if so, (v) what those valuations were.

92.     Omission of this material information makes the following Proxy information false and/or misleading:

(a)     from pages 58-62 of the Proxy:

**Certain Company Forecasts**

*Management Case Forecasts*

The Company does not, as a matter of course, make public projections as to its future financial performance. The Company management provided an initial set of financial projections to Ultimate Parent, the other parties who participated in the solicitation process for an acquisition transaction, and Evercore, which the Company approved for Evercore to rely on and use in performing its preliminary financial analyses (such financial projections, together with the extrapolations derived from such projections described below, the "September Management Case"). The Company management subsequently updated the September Management Case (1) to reflect Company management's updated view of the Company's fiscal year 2016 performance, (2) to adjust back to historical norms the level of capital expenditures starting from fiscal year 2018 onwards to reflect the end of a one-time capital project that was scheduled to be completed in fiscal year 2017, and (3) to reflect certain forecasts prepared in October 2016 in connection with the Company's annual goodwill impairment analysis (such financial projections, together with the extrapolations derived from such projections described below, the ("October Management Case"), and provided the October Management Case to Evercore, approving Evercore to rely on and use the October Management Case in performing its financial analyses and rendering its fairness opinion. The projections for the fourth quarter of fiscal year 2016 and the first quarter of fiscal year 2017 included in the October Management Case were also

provided to Ultimate Parent. Both the September Management Case and the October Management Case were for fiscal years 2016 through 2021, and included Company management's financial projections for fiscal years 2016 through 2019 and extrapolations derived therefrom for (a) fiscal years 2020 and 2021 for the Company generally and (b) fiscal years 2020 through 2026 for the switching, routing and analytics and software networking component of the Company's business for use in the sum of the parts valuation of that component (described in "The Merger — Opinion of Evercore Group L.L.C." beginning on page 48). The extrapolations were derived by projecting forward the general trends from fiscal years 2016 through 2019 but assuming slowing revenue growth rates as well as an eventual plateauing of operating margins to reflect the anticipated maturation of the Company's businesses. The September Management Case and the October Management Case, which, together with the Research Case Forecasts, constituted the alternative business assumptions reviewed by Evercore in connection with its financial analysis, are referred to collectively as the "Management Case Forecasts."

* * *

*The September Management Case* (1)

|  | 2016E | 2017E | 2018E | 2019E | 2020E(2) | 2021E(2) |
|---|---|---|---|---|---|---|
| | (in millions, except per share amounts) | | | | | |
| Revenue | $ 2,338 | $ 2,630 | $ 2,814 | $ 3,046 | $ 3,268 | $ 3,441 |
| Non-GAAP Gross Profit (3)(4) | $ 1,578 | $ 1,761 | $ 1,911 | $ 2,061 | $ 2,193 | $ 2,303 |
| Non-GAAP Operating Income(5) | $ 510 | $ 578 | $ 710 | $ 801 | $ 834 | $ 873 |
| Non-GAAP EBITDA(6) | $ 597 | $ 680 | $ 818 | $ 918 | $ 959 | $ 1,005 |
| Non-GAAP Net Income(7) | $ 395 | $ 424 | $ 529 | $ 603 | $ 630 | $ 663 |
| Non-GAAP EPS(8) | $ 0.95 | $ 1.03 | $ 1.29 | $ 1.47 | $ 1.54 | $ 1.62 |
| Capex | ($ 77) | ($ 90) | ($ 96) | ($ 104) | ($ 112) | ($ 118) |
| Unlevered Free Cash Flow(9) | — | $ 330 | $ 459 | $ 513 | $ 538 | $ 578 |

(1)     For each of fiscal years 2016, 2017, 2018, 2020 and 2021, the Company's fiscal year end is the final Saturday in October. For fiscal year 2019, the Company's fiscal year end is the first Saturday in November.

(2)     The September Management Case projections for fiscal years 2020 and 2021 were prepared by extrapolating from trends in the September Management Case projections for fiscal years 2016 through 2019 as described above.

(3)     Non-GAAP Gross Profit is calculated as GAAP gross profit less stock-based compensation expense, amortization expense associated with acquired intangibles and, for fiscal year 2016 only, the impact to cost of revenues from certain purchase accounting adjustments to inventory.

(4)     The Non-GAAP Gross Profit amounts presented in the table for fiscal years 2016 and 2017 represent the amounts provided to Ultimate Parent as part of the September Management Case. The Non GAAP Gross Profit amounts for fiscal years 2016 and 2017 reviewed by the Company Board for the September Management Case in certain instances were $1,588 and $1,774, respectively. These differences were immaterial and did not affect the results of any financial analyses reviewed by the Company Board. Such differences were eliminated when the Management Case Forecasts were updated to the October Management Case, which was used by Evercore in the financial analysis for its fairness opinion and reviewed by the Company Board in approving the Merger on November 1, 2016.

(5)     Non-GAAP Operating Income is calculated as GAAP operating income less stock-based compensation expense, acquisition and integration expense, amortization expense associated with acquired intangibles, restructuring charges, asset impairment charges, gains or losses relating to sales of assets and, for fiscal year 2016 only, the impact to cost of revenues from certain purchase accounting adjustments to inventory.

(6)     Non-GAAP EBITDA is calculated as GAAP earnings before interest, taxes, depreciation and amortization (including amortization expense associated with acquired intangibles), adjusted to exclude stock-based compensation expense, acquisition and integration expense, restructuring charges, asset impairment charges, gains or losses relating to sales of assets and, for fiscal year 2016 only, the impact to cost of revenues from certain purchase accounting adjustments to inventory.

(7)     Non-GAAP Net Income is calculated as GAAP net income less stock-based compensation expense, acquisition and integration expense, amortization expense associated with acquired intangibles, restructuring charges, asset impairment charges, gains or losses relating to sales of assets, the non-cash portion of the interest expense on the Company's 1.375% convertible senior unsecured notes due 2020 (the " Non-Cash Interest Expense ") and, for fiscal year 2016 only, the impact to cost of revenues from certain purchase accounting adjustments to inventory and the effects of certain intercompany transactions on the tax provision. The Company also excludes the tax impact of all such adjustments.

(8)     The Company derives Non-GAAP EPS from Non-GAAP Net Income using the same measures of outstanding shares as are used to calculate net income per share in accordance with GAAP.

(9)     Unlevered Free Cash Flow is calculated as GAAP earnings before interest and taxes, adjusted for depreciation and amortization (including amortization expense associated with acquired intangibles), capital expenditures, changes in working capital, changes in deferred revenue, stock-based compensation expense, acquisition and integration expense, restructuring charges, asset impairment charges, gains or losses relating to sales of assets and, for fiscal year 2016 only, the impact to cost of revenues from certain purchase accounting adjustments to inventory. Calculations of Unlevered Free Cash Flow were not included in the financial projections provided to Ultimate Parent or to the other parties who participated in the solicitation process.

*The October Management Case* (1)

| | 2016E | 2017E | 2018E | 2019E | 2020E(2) | 2021E(2) |
|---|---|---|---|---|---|---|
| | | | (in millions, except per share amounts) | | | |

| | | | | | | |
|---|---|---|---|---|---|---|
| Revenue | $ 2,333 | $ 2,630 | $ 2,814 | $ 3,046 | $ 3,215 | $ 3,365 |
| Non-GAAP Gross Profit(3) | $ 1,583 | $ 1,761 | $ 1,911 | $ 2,061 | $ 2,166 | $ 2,260 |
| Non-GAAP Operating Income(4) | $ 528 | $ 578 | $ 710 | $ 801 | $ 864 | $ 901 |
| Non-GAAP EBITDA(5) | $ 615 | $ 679 | $ 814 | $ 914 | $ 980 | $ 1,022 |
| Non-GAAP Net Income(6) | $ 411 | $ 424 | $ 529 | $ 603 | $ 654 | $ 685 |
| Non-GAAP EPS(7) | $ 0.98 | $ 1.03 | $ 1.29 | $ 1.47 | $ 1.60 | $ 1.67 |
| Capex | ($ 77) | ($ 90) | ($ 93) | ($ 101) | ($ 104) | ($ 109) |
| Unlevered Free Cash Flow(8) | — | $ 329 | $ 459 | $ 514 | $ 577 | $ 607 |

(1)     For each of fiscal years 2016, 2017, 2018, 2020 and 2021, the Company's fiscal year end is the final Saturday in October. For fiscal year 2019, the Company's fiscal year end is the first Saturday in November.

(2)     The October Management Case projections for fiscal years 2020 and 2021 were prepared by extrapolating from trends in the October Management Case projections for fiscal years 2016 through 2019 as described above.

(3)     Non-GAAP Gross Profit is calculated as GAAP gross profit less stock-based compensation expense, amortization expense associated with acquired intangibles and, for fiscal year 2016 only, the impact to cost of revenues from certain purchase accounting adjustments to inventory.

(4)     Non-GAAP Operating Income is calculated as GAAP operating income less stock-based compensation expense, acquisition and integration expense, amortization expense associated with acquired intangibles, restructuring charges, asset impairment charges, gains or losses relating to sales of assets and, for fiscal year 2016 only, the impact to cost of revenues from certain purchase accounting adjustments to inventory.

(5)     Non-GAAP EBITDA is calculated as GAAP earnings before interest, taxes, depreciation and amortization (including amortization expense associated with acquired intangibles), adjusted to exclude stock-based compensation expense, acquisition and integration expense, restructuring charges, asset impairment charges, gains or losses relating to sales of assets and, for fiscal year 2016 only, the impact to cost of revenues from certain purchase accounting adjustments to inventory.

(6)     Non-GAAP Net Income is calculated as GAAP net income less stock-based compensation expense, acquisition and integration expense, amortization expense associated with acquired intangibles, restructuring charges, asset impairment charges, gains or losses relating to sales of assets, the Non-Cash Interest Expense and, for fiscal year 2016 only, the impact to cost of revenues from certain purchase accounting adjustments to inventory and the effects of certain intercompany transactions on the tax provision. The Company also excludes the tax impact of all such adjustments.

(7)     The Company derives Non-GAAP EPS from Non-GAAP Net Income using the same measures of outstanding shares as are used to calculate net income per share in accordance with GAAP.

(8)     Unlevered Free Cash Flow is calculated as GAAP earnings before interest and taxes, adjusted for depreciation and amortization (including amortization expense associated with acquired intangibles), capital expenditures, changes in working capital, changes in deferred revenue, stock-based compensation expense, acquisition and integration expense, restructuring charges, asset impairment charges, gains or losses relating to sales of assets and, for fiscal year 2016 only, the impact to

cost of revenues from certain purchase accounting adjustments to inventory. Calculations of Unlevered Free Cash Flow were not included in the subset of the October Management Case provided to Ultimate Parent.

*The Research Case Forecasts* (1)

| | 2016E | 2017E | 2018E | 2019E(2) | 2020E(2) | 2021E(2) |
|---|---|---|---|---|---|---|
| | (in millions, except per share amounts) | | | | | |
| Revenue | $ 2,329 | $ 2,577 | $ 2,645 | $ 2,714 | $ 2,785 | $ 2,858 |
| Non-GAAP Gross Profit | $ 1,571 | $ 1,737 | $ 1,782 | $ 1,829 | $ 1,877 | $ 1,926 |
| Non-GAAP Operating Income | $ 509 | $ 562 | $ 594 | $ 611 | $ 641 | $ 672 |
| Non-GAAP EBITDA | $ 596 | $ 663 | $ 697 | $ 719 | $ 752 | $ 786 |
| Non-GAAP Net Income | $ 392 | $ 408 | $ 432 | $ 443 | $ 455 | $ 467 |
| Non-GAAP EPS | $ 0.93 | $ 1.00 | $ 1.06 | $ 1.08 | $ 1.11 | $ 1.14 |
| Capex | ($ 80) | ($ 81) | ($ 83) | ($ 85) | ($ 87) | ($ 89) |
| Unlevered Free Cash Flow | — | $ 333 | $ 404 | $ 418 | $ 440 | $ 462 |

For each of fiscal years 2016, 2017, 2018, 2020 and 2021, the Company's fiscal year end is the final Saturday in October. For fiscal year 2019, the Company's fiscal year end is the first Saturday in November.
The projections included in the Research Case Forecasts for fiscal years 2019 through 2021 were prepared by extrapolating from trends in the Research Case Forecasts for fiscal years 2016 through 2018, as described above.

(b)   From pages 55-56 of the Proxy:

*Sum of the Parts Analysis*

Evercore conducted a sum of the parts valuation analysis to calculate the enterprise value of four components of the Company's business (its Storage Networking component; its Switching, Routing, and Analytics ("SRA") and Software Networking component; its Campus component; and its Ruckus component) on a stand-alone basis, using the discounted cash flow methodology and the revenue multiple methodology, and based on forecasts included in the October Management Case. In its analysis, and upon advice of the Company's management, Evercore assumed no transactional costs or tax leakage costs in the separation of the Company into its various components.

For the Storage Networking component, Evercore performed a discounted cash flow analysis to estimate the implied enterprise value as of October 31, 2016, using (1) the unlevered, after-tax free cash flows that were projected to be generated by the Company from the period from November 1, 2016 through October 31, 2021, plus (2) the estimated terminal value of the Company as of October 31, 2021 based

on a perpetuity growth rate of -6.0% to -4.0%, reflecting the Company's perspective on the prospects for the Storage Networking component. The total cash flows were then discounted to present value using an estimate range of discount rates from 8.5% to 11.0%. Evercore estimated the Storage Networking component's weighted average cost of capital based on application of the capital asset pricing model and its professional judgment given the nature of the Storage Networking component. The resulting range of implied enterprise values for the Storage Networking component was approximately $2.8 billion to $3.6 billion.

For the SRA and Software Networking component, Evercore performed a discounted cash flow analysis to estimate the implied enterprise value as of October 31, 2016, using (1) the unlevered, after-tax free cash flows that were projected to be generated by the Company from the period from November 1, 2016 through October 31, 2026, plus (2) the estimated terminal value of the Company as of October 31, 2026 based on an Adjusted EBITDA multiple of 10.0x to 12.0x. Evercore estimated the terminal value multiple based on the financial projections provided by the Company's management, the trading multiples for the companies included in the selected publicly traded companies analysis, and its professional judgment given the nature of the SRA and Software Networking component. The total cash flows were then discounted to present value using an estimate range of discount rates from 8.5% to 11.0%. Evercore estimated the SRA and Software Networking component's weighted average cost of capital based on application of the capital asset pricing model and its professional judgment given the nature of the SRA and Software Networking component. The resulting range of implied enterprise values for the SRA and Software Networking component was approximately $1.1 billion to $1.6 billion.

For the Campus component, Evercore assumed a multiple range of 1.0x to 1.5x management's projection of the Company's estimated fiscal year 2017 revenue. The multiple range was derived by analyzing the results from an analysis of the revenue multiples for the companies included in the selected publicly traded companies analysis and took into account qualitative judgments for the nature of the business. The resulting range of implied enterprise values for the Campus component was approximately $0.3 billion to $0.5 billion.

For the Ruckus component, Evercore performed a discounted cash flow analysis to estimate the implied enterprise value as of October 31, 2016,

using (1) the unlevered, after-tax free cash flows that were projected to be generated by the Ruckus business from the period from November 1, 2016 through October 31, 2021, plus (2) the estimated terminal value of Ruckus as of October 31, 2021 based on an Adjusted EBITDA multiple of 9.0x to 11.0x. Evercore estimated the terminal value multiple based on the financial projections provided by the Company's management, the trading multiples for the companies included in the selected publicly traded companies analysis, and its professional judgment given the nature of the Ruckus component. The total cash flows were then discounted to present value using an estimate range of discount rates from 11.5% to 13.5%. Evercore estimated the Ruckus component's weighted average cost of capital based on application of the capital asset pricing model and its professional judgment given the nature of the Ruckus component. The resulting range of implied enterprise values for the Ruckus component was approximately $1.5 billion to $1.9 billion.

Separately, for the Ruckus component, Evercore also performed a valuation analysis using the historical acquisition cost of Ruckus, as of May 2016, in addition to using the discounted cash flow methodology. Based on publicly available historical financial statements, the implied enterprise value for the Ruckus component was determined to be approximately $1.2 billion (calculated using the total Ruckus purchase equity value of approximately $1.4 billion less available balance sheet cash of approximately $0.2 billion).

Evercore then took the aggregate value of the four combined operations, netted their value against the amount of the Company's projected net debt and noncontrolling interests as of October 31, 2016 and divided such amount by the fully diluted number of shares of Company Common Stock outstanding as of such date to imply a per share value for Company Common Stock. Using the discounted cash flow methodology for Ruckus, this analysis indicated an implied equity value per share range for the Company of approximately $12.30 to $16.50, rounded to the nearest five cents. Using the historical acquisition cost of Ruckus, this analysis indicated an implied equity value per share range for the Company of approximately $11.60 to $14.85, rounded to the nearest five cents.

(c)   From page 35 of the Proxy:

Also on September 16, 2016, as a follow-up to an introductory phone call that had taken place on August 12, 2016, between a representative of a private equity sponsor, which we refer to as Sponsor A, and Mr. Rado, representatives of the Company, including Messrs. Carney and Rado, met with a senior representative of Sponsor A to introduce each party to the business of the other party and to discuss Sponsor A's interest in various potential strategic transactions involving Sponsor A, one of Sponsor A's portfolio companies, and the Company. An acquisition of the Company by Sponsor A was not one of the possible strategic transactions discussed at such meeting.

(d)     From page 36 of the Proxy:

On October 2, 2016, Messrs. Carney and Tan spoke by telephone. Mr. Carney indicated that the Company Board would not support a transaction with Ultimate Parent unless there was a higher price than $13.00 per share. Mr. Tan stated that he could not support a price at that level, but that he would be convening a meeting of Ultimate Parent's board of directors to authorize a revised acquisition proposal providing for a per share purchase price of $12.75. Mr. Tan indicated that the revised proposed purchase price would be a "best and final" proposal from Ultimate Parent and that, if the Company Board elected to proceed based on that proposal, Ultimate Parent would expect to work toward signing a definitive agreement within thirty days.

(e)     From pages 42-43 of the Proxy:

Also on November 1, 2016, the Company Board met, with members of Company management and representatives of Wilson Sonsini and Evercore in attendance. The representatives of Wilson Sonsini discussed with the members of the Company Board their fiduciary duties under Delaware law. The representatives of Evercore discussed certain financial aspects of the $12.75 per share acquisition proposal made by Ultimate Parent, including a financial analysis of the Company based on the October Management Case, together with a summary of the updates from the September Management Case to the October Management Case, and the Research Case Forecasts. Following this presentation, the representatives of Evercore rendered an oral opinion to the Company Board, subsequently confirmed in its written opinion dated November 2, 2016, to the effect that, as of the date of such opinion, and based upon and subject to the assumptions, procedures, factors, qualifications and

limitations set forth therein, the Merger Consideration was fair, from a financial point of view, to the holders of the shares of Company Common Stock entitled to receive such Merger Consideration. For more information, see the section of this proxy statement entitled "The Merger — Opinion of Evercore Group L.L.C." beginning on page 48. The representatives of Wilson Sonsini then reviewed with the Company Board the material terms of the final Merger Agreement. The members of the Company Board discussed potential reasons for and against entering into the merger. After this discussion, the Company Board, after considering the factors more fully described in the section of this proxy statement entitled "The Merger — Opinion of Evercore Group L.L.C." beginning on page 48, unanimously: (1) determined that the Merger Agreement and the Merger were fair to, advisable and in the best interests of the Company's stockholders; (2) adopted and approved the Merger Agreement and the other transactions contemplated thereby; (3) directed that a special meeting of the Company's stockholders be held for the purposes of voting on the adoption of the Merger Agreement; and (4) recommended that the Company's stockholders vote in favor of the adoption of the Merger Agreement and approve the Merger and the other transactions contemplated by the Merger Agreement. The Company Board also authorized members of Company management to sign the Merger Agreement. The Corporate Development Committee provided its recommendation that Evercore be paid the discretionary fee contemplated by the Engagement Letter, reflecting the Company's satisfaction with Evercore's services and the Company Board approved the payment of such fee.

(f)     From pages 57-58 of the Proxy:

*Miscellaneous*

Under the terms of Evercore's engagement, Evercore has provided the Company with financial advisory services and delivered a written fairness opinion to the Company Board in connection with the proposed transaction. Pursuant to the terms of its engagement letter, Evercore is entitled to receive (1) an opinion fee of $2 million, regardless of the conclusion reached therein, which was earned upon delivery of its fairness opinion and which is fully creditable, to the extent previously paid, against any transaction fee payable and (2) a transaction fee, comprised of a success fee and a discretionary component (the payment of which was approved by the Company Board at a meeting on

November 1, 2016), currently estimated to total approximately $35.6 million, which Evercore will earn subject to and upon the consummation of the Merger. In addition, the Company has agreed to reimburse Evercore for up to $125,000 of expenses (including external legal fees, expenses and disbursements) incurred in connection with its engagement and to indemnify Evercore and any of its members, partners, officers, directors, advisors, representatives, employees, agents, affiliates or controlling persons, if any, against certain liabilities and expenses arising out of Evercore's engagement, any services performed by Evercore in connection therewith or any transaction contemplated thereby.

Evercore may, in the future, provide certain financial and other services to Ultimate Parent and certain of its affiliates, for which Evercore may receive compensation. Evercore notes that, while it has not, during the period from October 2013 to October 2016, performed any investment banking advisory and/or capital markets services to Ultimate Parent for which it received compensation, Evercore did advise Broadcom Corporation in its February 2016 sale to Avago Technologies Limited, both of which are now owned by Ultimate Parent, and Evercore did receive $10 million in connection with such engagement. Evercore's prior engagement with Broadcom Corporation was disclosed to the Company Board prior to the engagement by the Company of Evercore.

(g)     From page 31 of the Proxy:

The Company Board regularly evaluates the Company's strategic direction and ongoing business plans with a view toward strengthening the Company's business and enhancing stockholder value. As part of this evaluation, the Company Board has, from time to time, considered exploring a variety of strategic alternatives. These have included, among others: (1) the continuation of the Company's current business plan; (2) investment in, and development of, new products; (3) opportunities for potential expansion into new business lines through acquisitions and combinations of the Company with other businesses such as the Company's recent acquisitions of Ruckus Wireless, Inc. ("**Ruckus**"), Connectem Inc., and the SteelApp virtual application delivery controller product line from Riverbed Technology, Inc.; and (4) a possible sale of the Company or one or more of its business units.

* * *

On May 19, 2016, Messrs. Krause and Rado held a meeting in which Mr. Krause expressed Ultimate Parent's interest in exploring an acquisition of the Company's fibre channel business. They did not discuss price or any other potential terms. However, Mr. Krause stated that, if a transaction were going to be completed, Ultimate Parent would want to enter into it expeditiously. Messrs. Krause and Rado also discussed scheduling a meeting to introduce Mr. Carney and Mr. Hock E. Tan, the Chief Executive Officer and President of Ultimate Parent.

(h)     From pages 38-39 of the Proxy:

On October 15, 2016, the Transaction Committee met, with members of Company management and representatives of Evercore and Wilson Sonsini in attendance, to discuss the status of the transaction. Representatives of Evercore reported that Sponsor B and its co-bidder had indicated that Sponsor B's co-bidder was primarily interested in the wireless businesses of the Company and Sponsor B was interested in the remaining portion of the Company. . . . After discussion and input from Evercore, the Transaction Committee determined that a piecemeal sale was not likely to result in substantially greater stockholder value, particularly taking into account the considerable risks associated with such a strategy. The Transaction Committee also received an update on the status of Ultimate Parent's due diligence review and the expected timing for execution of a definitive agreement.

93.     Defendants' failure to provide Brocade stockholders with the foregoing material information renders the statements in the "Background of the Merger" and "Reasons for the Merger and Recommendation of the Board of Directors" sections of the Proxy false and/or materially misleading and constitutes a violation of Sections 14(a) and 20(a) of the Exchange Act.  The Individual Defendants were aware of their duty to disclose this information and acted negligently (if not deliberately) in failing to include this information in the Proxy.  Absent disclosure of the foregoing material information prior to the stockholder vote, Plaintiff and the other members of the Class

will be unable to make a fully-informed decision whether to vote in favor of the Proposed Transaction and are thus threatened with irreparable harm warranting the injunctive relief sought herein.

## CLAIMS FOR RELIEF

## COUNT I

**Class Claims Against Defendants for Violations of Section 14(a) of the Exchange Act And SEC Rule 14a-9 Promulgated Thereunder**

94.  Plaintiff repeats all previous allegations as if set forth in full.

95.  SEC Rule 14a-9, 17 C.F.R. §240.14a-9, promulgated pursuant to Section 14(a) of the Exchange Act, provides:

> No solicitation subject to this regulation shall be made by means of any proxy statement, form of proxy, notice of meeting or other communication, written or oral, containing any statement which, at the time and in light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading or necessary to correct any statement in any earlier communication with respect to the solicitation of a proxy for the same meeting or subject matter which has become false or misleading.

96.  During the relevant period, defendants disseminated the false and misleading Proxy specified above, which failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading in violation of Section 14(a) of the Exchange Act and SEC Rule 14a-9 promulgated thereunder.

97.     By virtue of their positions within the Company, the defendants were aware of this information and of their duty to disclose this information in the Proxy. The Proxy was prepared, reviewed, and/or disseminated by the defendants.   The Proxy misrepresented and/or omitted material facts, including material information about the unfair sale process for the Company, the unfair consideration offered in the Proposed Transaction, and the actual intrinsic value of the Company's assets.   The defendants were at least negligent in filing the Proxy with these materially false and misleading statements.   The defendants have also failed to correct the Proxy and the failure to update and correct false statements is also a violation of Section 14(a) of the Exchange Act and SEC Rule 14a-9 promulgated thereunder.

98.     The omissions and false and misleading statements in the Proxy are material in that a reasonable stockholder would consider them important in deciding how to vote on the Proposed Transaction.   In addition, a reasonable investor would view a full and accurate disclosure as significantly altering the "total mix" of information made available in the Proxy and in other information reasonably available to stockholders.

99.     By reason of the foregoing, the defendants have violated Section 14(a) of the Exchange Act and SEC Rule 14a-9(a) promulgated thereunder.

100.   Because of the false and misleading statements in the Proxy, Plaintiff and the Class are threatened with irreparable harm, rendering money damages

inadequate.   Therefore,   injunctive   relief   is   appropriate   to   ensure   defendants'
misconduct is corrected.

## COUNT II

**Class Claims Against the Individual Defendants for
Violation of Section 20(a) of the Exchange Act**

101.   Plaintiff repeats all previous allegations as if set forth in full.

102.   The   Individual   Defendants   acted   as   controlling   persons   of   Brocade
within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue
of their positions as officers or directors of Brocade and participation in or awareness
of the Company's operations or intimate knowledge of the false statements contained
in the Proxy filed with the SEC, they had the power to influence and control and did
influence and control, directly or indirectly, the decision-making of the Company,
including the content and dissemination of the various statements which Plaintiff
contends are false and misleading.

103.   Each of the Individual Defendants was provided with or had unlimited
access to copies of the Proxy and other statements alleged by Plaintiff to be
misleading prior to or shortly after these statements were issued and had the ability to
prevent the issuance of the statements or cause the statements to be corrected.

104.  In particular, each of the Individual Defendants had direct and
supervisory involvement in the day-to-day operations of the Company, and, therefore,
is presumed to have had the power to control or influence the particular transactions

giving rise to the securities violations as alleged herein, and exercised the same. The Proxy at issue contains the unanimous recommendation of each of the Individual Defendants to approve the Proposed Transaction. They were, thus, directly involved in the making of this document.

105.   In addition, as the Proxy sets forth at length, and as described herein, the Individual Defendants were each involved in negotiating, reviewing, and approving the Proposed Transaction. The Proxy purports to describe the various issues and information that they reviewed and considered — descriptions which had input from the Individual Defendants.

106.   By virtue of the foregoing, the Individual Defendants have violated Section 20(a) of the Exchange Act.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands injunctive relief, in its favor and in favor of the Class and against defendants, as follows:

A.     Ordering that this action may be maintained as a class action and certifying Plaintiff as the Class representative and Plaintiff's counsel as Class counsel;

B.     Preliminarily and permanently enjoining defendants and all persons acting in concert with them from proceeding with, consummating, or closing the Proposed Transaction and any vote on the Proposed Transaction, unless and until

defendants disclose and disseminate the material information identified above to Brocade stockholders;

C.      In the event defendants consummate the Proposed Transaction, rescinding it and setting it aside or awarding rescissory damages to Plaintiff and the Class;

D.      Awarding Plaintiff the costs of this action, including reasonable allowance for Plaintiff's attorneys' and experts' fees; and

E.      Granting such other and further relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury on all claims and issues so triable.

Dated: December 21, 2016          **WEISSLAW LLP**
                                  Joel E. Elkins

                                  By: */s/ Joel E. Elkins*

                                  Joel E. Elkins
                                  9107 Wilshire Blvd., Suite 450
                                  Beverly Hills, CA 90210
                                  Telephone:  310/208-2800
                                  Facsimile:   310/209-2348
                                         -and-
                                  Richard A. Acocelli
                                  1500 Broadway, 16th Floor
                                  New York, NY  10036
                                  Telephone: 212/682-3025
                                  Facsimile:  212/682-3010

                                  William B. Federman
                                  Federman & Sherwood
                                  10205 N. Pennsylvania Ave.
                                  Oklahoma City, OK 73120
                                  Telephone: (405) 235-1560
                                  Facsimile: (405) 239-2112

*Attorneys for Plaintiff and
the Proposed Class*

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

COMPLAINT